RUIZ, Senior Judge,
dissenting in part.
This appeal presents us, for the first time, -with an opportunity to interpret the parental kidnapping statute, D.C.Code § 16-1022 (2012 Repl.), and to provide needed guidance on what the statute requires in terms of proof.[1] The operative facts in this case are simple and undisputed: In contravention of a court instruction, Ms. Fleet went to Mr. Fleet’s workplace, with their fourteen-month-old daughter, with the intent to surreptitiously take the car that Mr. Fleet had been using. The car was parked in the parking lot in front of THEARC (Town Hall Education Arts Recreation Campus), a well-known community arts center where Mr. Fleet has been the Executive Director' for ten years. Ms. Fleet placed the child in the parked car that she was trying to spirit away. Mr. Fléet observed what was happening from his office window at the front of THEARC, came out to the parking lot, sat in the car with the child (where Ms. Fleet had placed her), and called for a police officer to intervene in Ms. Fleet’s unlawful attempt to remove the car. Ms. Fleet became angry and started to yell and curse at him to get out of the car and also called the police. Mr. Fleet exited the car with the-child and walked with the infant, in her car seat, to his office. He testified that he did so because he wanted to “protect his daughter” by removing her from the tense encounter and Ms. Fleet’s, angry outburst. His actions took place in a public area, in broad daylight, in the presence of Ms. Fleet, police officers who responded to the Fleets’ calls, and several passers-by. When Ms. Fleet demanded through a police officer that the child be returned to her because Mr. Fleet’s visitation was not scheduled until that afternoon, Mr. Fleet, immediately and without resistance, turned the child over.
*993 It is undisputed that Ms. Fleet was in the wrong in trying to take the car from Mr. Fleet’s parking lot.[2] Their argument was over possession of the car, not custody of the child. As the majority acknowledges, the entire incident, from when Ms. Fleet arrived with the.child planning to take the parked car, to when she left with the child was about twenty minutes. Within that time frame, the trial court found, the actions that constituted “parental kidnapping” — from when Mr. Fleet entered the parked car, took his child from the car, walked to his office with her in the car seat and returned the child to the mother — took less than three minutes. Mr. Fleet did so after he had asked that'a police officer be summoned. There was no deception, no surreptitious or violent behavior, no sustained or substantial withholding of the child from Ms. Fleet, and no refusal or resistance when Mr. Fleet was requested to return the child.
Notwithstanding that it was Ms. Fleet who provoked the confrontation over the car, the minimal amount of time and distance . involved in, moving the child from the car to the office, and Mr, Fleet’s testimony that he acted out of concern for his daughter’s welfare, the majority concludes that the evidence suffices to support the trial court’s finding that there was good cause to believe Mr, Fleet was guilty, of parental kidnapping. In my view this conclusion is based on a too-literal interpretation of the parental kidnapping statute and on inferences about Mr, Fleet’s intent that the evidence does not reasonably support. I also conclude that the entry of a CPO against Mr. Fleet is unwarranted not only because of this unsupported finding but also because of the history of Mr. Fleet’s past compliance with visitation orders. The outcome in this case unfairly tars Mr. Fleet as likely to have .committed a criminal misdemeanor. D.C.Code § 16-1024(a) (2012 Kepi). Beyond the unfairness in this particular case, a determination that the parental kidnapping-statute is violated on facts as trivial as these, I fear, has the potential to cause much mischief in the future by adding another arrow to the quiver of feuding spouses', in .the unfortunate fight for advantage,in divorce and custody actions. For these reasons, I dissent;
I. Parental Kidnapping
The provision of the parental kidnapping statute on which the majority relies has four principal elements — one defines the status of the person; two concern the person’s mental state, with separate knowledge and intent requirements; and one lists the prohibited acts (actus reus): .
(l).the person must be a “relative” (defined to include a parent, D.C.Code § 16-1021(4) (2012 Repl.)) or a person acting pursuant to the relative’s direction,
(2) the person must know that “another person’.is the lawful custodian of a child,”
*994 (3) the person must “abduct, take or carry away a child,” and
(4). the person must do so “with the intent to prevent a lawful custodian from exercising the right -to custody of the child.”[3]
■ The first two elements are not in dispute.[4] The majority concludes that by taking his daughter out of the car and carrying her to his office, Mr. Fleet’s actions satisfied the actus reus element of “abduct[ing], tak[ing], or carrying] away” the child. That literal interpretation of the statute is not reasonable for a parental kidnapping statute, especially when applied to very young children. In this case, for example, we are dealing with a fourteen-month-old infant who, of necessity, always must be “taken” or “carried” when a parent has any physical contact to move her. Under the majority’s literal interpretation, a parent runs the risk of engaging in the actus reus proscribed by the parental kidnapping ■ statute by, for example, transferring a child in a -car seat from- a window exposed to too much sun to a shaded one or changing her diaper. Or, in the case of older children,'a parent who drives a child to school, or -takes the child on a bus to the park.’[5]
The majority rejects any consideration of the short duration or distance involved in this cáse — the less than three minutes it took for Mr. Fleet to take his daughter from the car parked in front of THEARC, cross the driveway to his office at the front of the building, and return the child at Ms. Fleet’s request. Citing Richardson v, *995 United States, 116 A.3d 434, 438-39 (D.C.2015), the majority concludes there is no durational or distance requirement in the parental kidnapping statute. I see two problems with that reasoning. Richardson- involves the general criminal kidnapping statute, which employs different language and, by its terms, specifically does not apply to parents and children. Compare D.C.Code 22-2001[6] ivith D.C.Code § 16 — 1022(b)(1), supra note 3. Moreover, in a recent opinion, this court, while acknowledging the holding in Richardson as binding authority under M.A.P v. Ryan, 285 A.2d 310, 312 (D.C.1971), pointed to scholarly warnings against such broad interpretations of kidnapping statutes, noting the trend in other jurisdictions toward more narrow constructions and the Model Penal Code’s definition requiring a “substantial” distance or time. See Spencer v. United States, 132 A.3d 1163, 1172, n. 10 (D.C.2016). In this case, unlike in Spencer, M.A.P. does not compel us to adopt Richardson's,' dubious interpretation for the parental kidnapping statute.
The majority also cites another subsection of the parental kidnapping statute as support for its conclusion that any physical movement of a child regardless of duration or distance satisfíés the statute’s requirement of “taking'or carrying away.” This subsection requires, in addition to the same intent required by subsection (b)(1) of an intent to prevent the lawful custodian’s rights, a forty-eight-hour holdover after a reasonable demand for the return of fite child in the specific situation where the child is being withheld by a person who “obtained actual physical control of the child for a limited time” in the exercise of visitation rights pursuant to court order. D.C.Code § 16 — 1022(b)(3).[7] From this explicit forty-eight-hour requirement in subsection (b)(3) the majority concludes that there is no durational element-for the offense under subsection (b)(1). This is a non sequitur for even if there is .no specified minimum duration or distance required under subsection (b)(1), that does not mean that the trivial time lapse and short distance involved in this case are irrelevant on the question whether there has been a parental kidnapping. This is particularly so with respect to the statutory requirement that Mr. Fleet’s actions have been taken with “the intent to prevent” Ms. Fleet from exercising her right to physical custody of the child at that time.
The short time and distance involved in this case, along with the circumstances as a whole, say a lot about Mr. Fleet’s intent when he briefly moved the child to his office in response to Ms. Fleet’s untoward action and angry outburst. At most, Ms. Fleet’s custodial rights were slightly infringed and only in the sense that she did not exercise exclusive physical control during the few minutes that Mr. Fleet removed the child from the altercation. Ms. Fleet’s right to custody was not questioned nor was she prevented from asserting it. To the contrary, as soon as she asked, the *996 child was returned to her. The majority cites no authority supporting a finding of parental kidnapping in similar circumstances. Cf. Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir.2005) (in case challenging detention as violative of Fourth Amendment, officers could reasonably believe that grandfather of child was committing an offense as they thought mother had custody and grandfather “was indisputably involved in hindering the officers’ attempts to return [the child] to [the mother.]”); Johnson v. Johnson, 185 Tenn. 400, 206 S.W.2d 400, 403 (1947) (holding Tennessee child abduction statute’s prohibition on “unlawfully] taking or decoy[ing] away” a child “with intent to detain or conceal such child from its parents, guardian or other person having lawful charge of such child” is violated by probf of “forcible or surreptitious” removal of child by parent with knowledge of other’s custody) (citing Hicks v. State, 158 Tenn. 204, 12 S.W.2d 385 (1928)); State v. O’Dell, 181 Vt. 475, 924 A.2d 87, 89-91 (2007) (holding that non-custodial mother’s two-hour refusal to surrender child violated statute prohibiting “taking, enticing or keeping a child from the child’s lawful custodian, knowingly, without a legal right to do so.”).
The majority affirms the trial court’s finding that Mr. Fleet acted with the intent to prevent Ms. Fleet from exercising her right to physical custody of their child. The trial court recognized Mr. Fleet’s testimony that he 'had acted out of concern for the welfare of the child, to remove her from harm’s way because Ms. Fleet was “‘spewing expletives,’ ‘agitated’, ‘out of control,’ and ‘acting crazy.’ ” As the trial court noted, Mr. Fleet’s testimony about Ms. Fleet’s behavior was corroborated by other witnesses, a video,[8] and Ms. Fleet herself. The trial court found Mr. Fleet to be a credible witness and did not question Mr. Fleet’s testimony that be acted out of concern for his daughter and wanted to protect her.[9] Rather, the trial court found that he “also Had the specific intent to prevent Ms. Fleet, who' had lawful physical custody of her daughter at that time, from exercising her rights to physical custody at that time.” (emphasis added).
It is important to bear in mind that merely the fact that Mr. Fleet knew it was Ms. Fleet’s assigned time with the baby is not enough, without more, .to prove that he acted with the purpose of preventing Ms. Fleet’s exercise of custodial rights. That is clear from the face of the parental kidnapping statute which. requires, as two separate elements, both “knowledge” that another is the lawful custodian of the child *997 and the specific “intent to prevent” that custodian’s exercise of the right to custody.
Intent is rarely self-evident and the trial court is allowed to make reasonable inferences about a person’s intent from the person’s actions. To be reasonable, inferences must be based on the evidence and take into account the circumstances as a whole; otherwise, an inference is imper-missibly speculative. The circumstances in this case do not reasonably permit an inference that Mr. Fleet acted with the intent (i.e., for the purpose) of preventing Ms. Fleet’s right to custody. Here, the tense confrontation bétween the Fleets over the car took place outdoors, in a parking lot, oh a day in early March that Ms. Fleet described as “cold.” It was Ms. Fleet who chose to put the child on the back seat of the car she was surreptitiously trying to take, and Mr. Fleet was justified in trying to prevent her from doing so and waiting for a police officer to intervene. He also was justified, as a father, in trying to protect his child from the tense situation. Faced with these circumstances, Mr. Fléet made the choice to take the child to his office directly across the street, where she could be safe inside. Is it reasonablé to infer that because he did not instead leave' the child in the car, or place her outside on the parking lot or the sidewalk, he acted with the intent to prevent Ms. Fleet’s custody?
In support of the finding that Mr. Fleet had the requisite intent to prevent Ms. Fleet’s custody, the majority cites with approval the trial court’s observation that by his actions Mr/ Fleet “entirely removed] the child from Ms. Fleet’s presence” and “removed the child not just out of earshot from Ms. Fleet, but he also removed the child from her ability to even see her child or leave with her child if she so chose to leave.” The reasonableness of an inference of intent to prevent custody drawn from these facts is questionable because custodial rights • are not defeated merely because a child is not continually in the custodial parent’s presence, earshot, or field of vision, as-happens regularly when a child is in daycare, on a playdate, or at school. Moreover, the evidence does not support the asserted factual premise that the child was “entirely removed” from Ms. Fleet’s presence or view as she was well aware — as were the police officers and .others standing by — of where Mr.; Fleet took the child. Ms; Fleet could simply have followed them into the building if she had wanted to do so. Nor does the record support that Ms. Fleet was prevented -from leaving with-her child. What the record supports is the opposite for, according to Officer Garner’s testimony, as soon as Ms. Fleet asserted her right to custody by asking the police officer for the child, Mr. Fleet immediately and without any resistance handed her over. Ms. Fleet then left with the child.
The majority’s conclusion that the evidence supports that Mr. Fleet acted with the intent to prevent Ms. Fleet’s right to custody is puzzling because it is undercut by, findings of the trial court that are cited with’ approval by the majority. According to the majority:
(1) the parental kidnapping at. issue in this case was troubling, because such kidnappings can quickly escalate into violence; (2) Mr. Fleet himself recognized that the incident on March 10, 2014, created a “volatile situation”; (3) the present CPO petitions were part' of a series of "allegation's that demonstrated the contentious relationship between the parties; and (4) previous CPO petitions, although voluntarily withdrawn, included serious allegations of assault, threats, and destruction of property. Taken together, the trial court explained, these considerations supported a conclusion that the parties’ interactions could eventually threaten their safety and that of *998 the child, and that a CPO was warranted to “ensure peace and safety.”
Ante at 989.
These facts do not support that Mr. Fleet had the intent to prevent Ms. Fleet’s custody. To the contrary, they support Mr. Fleet’s testimony that his intent was to protect his daughter by removing her from the altercation, which he recognized as a “volatile situation” in light of the Fleets’ continuing disagreements and accusation. By taking her to his nearby office, and doing so in the presence of Ms. Fleet and police officers he had called for, Mr. Fleet acted in response to a situation initiated by Ms. Fleet in a manner he deemed commensurate to the exigencies of the situation. The issue of intent for parental kidnapping is not whether a parent’s actions were wise or the only available course, but whether they were motivated by a desire to prevent the lawful custodian’s exercise of custody. It is an undisputed fact of this case that when Ms. Fleet asked for the child less than three minutes after Mr. Fleet removed her from the car, he immediately gave the child back to her. By his prompt compliance, Mr. Fleet recognized that Ms. Fleet had custody at the time and respected her assertion of custodial rights.
According to the majority, its disagreement with my dissent is “primarily factual.” Appellate court review, however, is not fact-finding. The interpretation of a statute is a question of law. See District of Columbia Office of Tax & Revenue v. BAE Sys. Enter. Sys., Inc., 56 A.3d 477, 480 (D.C.2012). As explained above, in my opinion the majority’s literal interpretation of the parental kidnapping statute is legally incorrect. Appellate review for sufficiency of the evidence is also a question of law. See Roy v. United States, 652 A.2d 1098, 1103 (D.C.1995). I conclude, as a matter of law, that the evidence in this case does not suffice to support a finding by a preponderance of the evidence that Mr. Fleet engaged in a parental kidnapping of his child.
II. Civil Protection Order[10]
The conclusion I reach in the preceding section would remove a determination that is a necessary precondition to the granting of a CPO. See D.C.Code § 16-1005(c) (2015 Supp.) (requiring “good cause to believe” that an Intrafamily Offense, such as parental kidnapping, has been committed). The entry of a CPO against Mr. Fleet is also unwarranted when the evidence is considered in its totality. We have repeatedly emphasized the importance that the court take into account the “entire mosaic” of the parties’ relationship in deciding whether to impose, a CPO. Cruz-Foster v. Foster, 597 A.2d 927, 930 (D.C.1991). In this case, the court commented generally that the parties “have had a turbulent relationship that has often teetered on the edge of violence,” referring to “allegations” in the record in this case and prior CPO petitions filed by the parties against each other. Those CPO petitions had been voluntarily withdrawn, however, and no determinations 'had been made. The court in this case did not purport to review the allegations made in those prior petitions to determine which party was at fault by making an assessment of credibili *999 ty or the likelihood that there was any support for the allegations. Instead, the court commented on the nature of the “troubling” crime of parental kidnapping generally as one that could “escalate to a violent situation quickly as emotions easily would be expected to run high in matters involving children being taken away from a parent.” The court also made reference to. a study funded by the U.S. Department of Justice which mentioned that “fathers were much more likely to use force to abduct their children or to retain them by not returning them- from a visitation, whereas mothers rarely used force to abduct their children.” These observations may be true as general propositions, but they have nothing to do with this case where there was no violence from Mr. Fleet or history of abusing visitation rights. '
Indeed, when the court focused on the facts of this case, it expressly found to the contrary in granting visitation rights to Mr. Fleet in spite of the entry of a CPO:
[Mr. Fleet] has handled visitation on numerous occasions in the past. There has never been a safety concern during the visitation. Even during the incident that was the subject matter of the [CPO] trial, there was no evidence that the minor child’s safety was ever compromised. Accordingly, the court granted visitation, finding that the respondent’s visitation with the minor child would not endanger [Ms. Fleet] or the child.
Mr. Fleet’s past actions, acknowledged by the court, should have weighed against the entry of a CPO for “a defendant’s past conduct is important evidence — perhaps the most important — in predicting his probable future conduct.” Cruz-Foster, 597 A.2d at 930. Subsequently, after this court remanded the case for more explicit findings, the court added that Mr. Fleet recognized that the morning’s altercation in the parking lot over the car was a “volatile situation” as evidenced by the fact that he had sent his parent to collect the child in the afternoon at the appointed hour. But what Mr. Fleet’s actions show — both during the morning incident in the'parking lot and in the arrangement he made for the afternoon’s transfer of custody — is his ability to recognize and act to defuse a volatile situation. These actions also form part of the entire mosaic that must be taken into account. Instead of getting credit for his past behavior during visitations and his demonstrated ability to act to prevent an escalation of tensions, however, he was slapped with a CPO.
The trial court was clearly motivated by the desire to enter an order that would, as the court expressed, “ensure peace and safety by reducing or prohibiting interactions between the parties” in light of the “pattern of allegations and discord ... [which] supports the conclusion that the parties were unlikely to have positive interaction's with each other and this discord could eventually threaten their safety or their daughter’s.” That is a laudable goal and one difficult to achieve when the trial court is put in the unenviable role of refereeing betweén feuding parents, but it may not be accomplished by imposing a CPO without necessary and well-supported findings grounded in the facts of the case. Where'two parties are bickering it is‘unfair to lay the onus of a CPO on one simply for the sake of ensuring the peace of both in the future. A CPO can' have legal consequences for a parent, see D.C.Code § 16-914(a)(3)(F) (“In determining the care and custody of a child, the best interest of the child shall be the primary consideration. ,:To determine the best interest of the child, .the court shall consider .all relevant factors, including, but not limited to ... evidence of an intrafamily offense.”); Wilkins v. Ferguson, 928 A.2d 655, 669 (D.C.2007), and merely the fact of its entry could affect the parent’s standing *1000 and relationship with the child and others in the family. A CPO is, without a doubt, an important tool that should be used in the full exercise of the court’s discretion to achieve the purposes of the statute, but it must be wielded with care. In this case, I conclude that its use was legally unsubstantiated and unjustified.

, The Fleets had two cars. The one being used by Mr. Fleet was titled in Ms. Fleet’s name. The one being used by Ms. Fleet was leased. The trial court in the divorce case had deferred making any changes on who should have which -car and instructed the parties only the previous week to keep the status quo pending further order of the court. Ms. Fleet, however, decided to take matters into her own hands,, planning to take both cars (she. had arranged to have one towed). One of the officers, who responded to the scene of the argument confirmed that the car was registered in Ms. Fleet’s name, but Ms. Fleet did not-answer when the officer queried whether there was any court order pertaining to the car or inform the officer that Mr. Fleet was supposed to have possession of the car. The officer then instructed Mr. Fleet to remove his belongings from the car so that Ms. Fleet could drive it away. Instead, she left the car and went to court to file a CPO petition.

. D.C.Code § 16 — 1022(b)(1) provides:
No relative, or any person acting pursuant to directions from the relative, who knows that another person is the lawful custodian of a child may:
(1) Abduct, take, or carry away a child with the intent to prevent a lawful custodian from exercising rights.to custody of the child.

. Mr. Fleet is the child's father and he was ■ aware of the court-ordered schedule that gave custody to Ms. Fleet at the time of the confrontation in the parking lot; his right to visitation was later in the day.

. The majority avoids addressing the trial court’s finding that Mr. Fleet also violated another subsection of the statute, D.C.Code § 16-1022(a), by "concealing” the child because she was not in her mother’s line of sight when Mr. Fleet took her into his office. Two obstacles to a visual connection were cited: a van that had parked in front of THEARC temporarily blocked Ms. Fleet’s view as Mr. Fleet walked to the building, and that Ms. Fleet could not look into Mr. Fleet’s office from where she was standing in the parldng lot, A video from a security camera introduced into evidence shows, however, that Mr, Fleet walked for only a few seconds behind the van on his way into the building and that THEARC is housed in a glass-fronted building. Several persons, some with children, are seen entering and exiting the building. The testimony is that Mr. Fleet’s office is at the front of-the building, 'overlooking the parking lot where Ms. Fleet was standing; there is no reason to doubt that Ms. Fleet knew where 'Mr. Fleet’s office was located’ and that she could have walked into the building. In other words, the same literal interpretation of the "taking” and "carrying away” provision of the parental kidnapping- statute pervades the trial court’s interpretation of the "concealment” provision. It is a strained interpretation that does not comport with commonsense understanding of- what it means to "conceal” ,in the context of kidnapping. See People v. Manning, 334 Ill.App.3d 882, 268 Ill.Dec. 600, 778 N.E,2d 1222, 1226 (2002) (applying common understanding to undefined statutory term "conceal” as meaning to “hide or keep from observation, discovery, or understanding; keep-secret,” and concluding evidence sufficient to find concealment where the jury reasonably could have inferred that defendant intended to hide child and keep her from her mother's observation where child was taken out of state and country surreptitiously and mother was not notified of whereabouts for nineteen days); State v. Fitman, 811 N.W.2d 120, 123 (Minn.Ct.App.2012) (“Concealing children requires actively hiding them or attempting to keep another from discovering their whereabouts.”).

. The general criminal kidnapping statute provides:
Whoever shall be guilty of, or of áiding or abetting in, seizing, confining, inveigling, enticing, decoying, kidnapping, abducting, concealing, or carrying away any individual by any means whatsoever, and holding or detaining, or with the intent to hold or detain, such individual for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction thereof, be punished by imprison- - ment for not more than 30 years.
D.C.Code § 22-2001 (2001) (emphasis added).

. This is the subsection that would apply to Mr. Fleet’s same actions if, instead of trying to take the car in the morning when she had custody of the child, Ms. Fleet had attempted to take the car later in the day, when Mr. Fleet had visitation hours.

. A second video introduced into evidence was taken from inside the car Ms. Fleet was trying to abscond with. Mr. Fleet was sitting in the car to prevent Ms. Fleet from taking it. The video shows a very angry Ms. Fleet, standing outside the car, yelling at the top of her voice: ‘‘Get out of the car, Edmund, and stop being a fucking child.” At the time, their daughter was in the back seat where Ms. Fleet had placed her.

. The trial court commented that there was no evidence that the child was "in danger of imminent physical harm ... or was suffering from any emotional harm.” "Imminent physical harm” is the standard for asserting a defense to parental kidnapping, D.C Code 16-1023(a)(1), and is largely irrelevant to whether Mr. Fleet had the intent to prevent Ms. Fleet’s custody, which is the statutory element that must be proven before a finding of parental kidnápping. can be made. Only after that finding has been made does the defense come into play. On the issue of intent, whether there was evidence of an actual risk of physical or emotional harm to the child does not determine whether Mr. Fleet genuinely had that concern. The court itself expressed a similar concern when it found, in granting the CPO, that the altercation over Ms. Fleet’s attempt to take the car created a "volatile situation” and that a past “pattern of allegations and discord” meant "their discord could eventually threaten their safety or their daughter’s.”

. In this case, each party had' petitioned the court for a CPO against the other. The trial court granted Ms. Fleet’s petition and denied Mr. Fleet’s. As the majority opinion relates, the trial court rejected the legal theoiy upon which Mr. Fleet’s petition was filed (theft of the car) and, on appeal, Mr. Fleet has abandoned that theory and presented a new one (unlawful entry of the car). On this record, I agree with the majority’s conclusion that the trial court did not commit plain error in denying entry of a CPO against Ms. Fleet. I therefore join Part IV of the majority opinion. I dissent, however, from the majority’s affir-mance of the entry of a CPO against Mr. Fleet.